444

The REISS STEAMSHIP COMPANY,
a corporation, Libelant,

v.

UNITED STATES STEEL CORPORA-
TION, PITTSBURGH STEAMSHIP DI-
VISION, a corporation, Respondent.

UNITED STATES STEEL CORPORA-
TION, a corporation, Cross-Libelant,

v.

The REISS STEAMSHIP COMPANY,
a corporation, Cross-Respondent.

No. A64–56.

United States District Court
N. D. Ohio, E. D.

May 27, 1965.

Thomas O. Murphy, Johnson, Branand & Jaeger, Cleveland, Ohio, for libelant.

Robert G. McCreary, Jr., Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for respondent.

CONNELL, Chief Judge.

## FINDINGS OF FACT

1. At 5:45 A.M. September 24, 1962 libelant's steamer J. L. Reiss (hereinafter referred to as "the Reiss") was in collision in the St. Clair River below Roberts Landing and above Willow Point with respondent's steamer Sewell Avery (hereinafter referred to as "the Avery"). The upbound vessel, the Reiss, built as a straight decker in 1906 and later converted to a self-unloader, with a length of 489′ and a beam of 52′, is an old, slow, single-screw, steam-powered, steel vessel of 1650 horse power. The downbound vessel, the Avery, built in 1943, 2500 horse power, is 605′ in length with a beam of 60′.

2. In the area involved the river extends almost due north and south. Between the east and west shores the river is 2200′ wide and there is 1700′ between the channel banks of the navigable portion of the river. Buoy No. B37, displaying a flashing white light, is located 1700′ above Roberts Landing and is commonly referred to as Roberts Landing Buoy. Willow Point is situated about 1 mile south of Roberts Landing and is designated by a fixed navigational aid on the west bank of the river, displaying a flashing green light. Below Willow Point is Buoy R36 which displays a flashing red light.

3. The Reiss was on a voyage from Toledo, Ohio to Two Rivers, Wisconsin laden with a cargo of coal, her draft being 16′ 9″ forward and 19′ 6″ aft. On the early morning of September 24, 1962 she was followed in the St. Clair River by the steamer Henry R. Platt, Jr. (hereinafter referred to as "the Platt"). The Avery, on a voyage from Calcite, Michigan to Lorain, Ohio, was laden with a cargo of stone and her draft was 28′ 8″ forward, 24′ 2″ aft. Current in the area of the river involved generally is 2 to 3 miles per hour; downbound vessels run with the current.

4. As the Avery proceeded downbound in the river, visibility became hazy and

she decided to anchor. After the Avery's engines were stopped and backed, her stern anchor was dropped at 5:00 A.M. and the Avery broadcast on her radiotelephone that she was anchoring. Her second mate, stationed on the stern, released the stern anchor but, although it was intended that only 45 fathoms of the chain should be used, nearly all of the 70 fathoms of the chain ran out, which situation required later the attention of several members of the Avery's crew.

5. Proceeding upbound at her regular full speed of 8 to 9 miles per hour under existing conditions, the Reiss encountered haze at about 4:30 A.M. The first mate who was in charge of navigation called the Reiss' captain who then took over her navigation. By means of her radiotelephone the Reiss heard other vessels in the river and became aware of their movements. The Reiss contacted another vessel further upstream and was advised that visibility was approximately ¼ of a mile. The Reiss was equipped with efficient radar and she was using it. When the fog closed in at 4:50 A.M., the Reiss' speed was checked to half ahead or 4 to 5 miles per hour. Thereafter, the Reiss maintained sufficient speed for steerageway. Upon encountering the fog the Reiss commenced sounding the prescribed three blast whistle signal for vessels underway in fog.

6. When the Reiss heard the Avery's radiotelephone message to the effect that she was going to anchor near Roberts Landing Buoy, the Reiss on her radar observed the Avery below Port Lambton close to the Canadian shore. The Avery was not near where she said she was going to anchor. By using the variable range finder on her radar the Reiss determined that she then was 2 miles below Roberts Landing Buoy (B37) and that the Avery was 1.2 miles upstream from the Reiss, blending into the Canadian shore line on the east shore of the river.

7. As the Reiss encountered fog and commenced sounding her fog signals, the Platt was approximately 2 miles behind the Reiss. When the Platt encountered the fog, she also checked her speed and commenced sounding three blast fog signals. Since the Platt was a more powerful and faster vessel than the Reiss, the Platt continued to catch up to the Reiss as the vessels approached Willow Point. Subsequent to checking her speed to half ahead upon encountering fog, the Reiss reduced her speed to slow ahead for short intervals with the result that her speed over the ground ultimately was 2 miles per hour when she passed Willow Point. Both the Platt and the Reiss constantly sounded their three blast fog signals at one minute intervals all the way up the stream. By thus sounding such signals each was able to determine the relative position of the other as the two vessels continued upstream.

8. At 5:16 A.M. the Reiss broadcast a security call on her radiotelephone advising that she was upbound in the vicinity of Willow Point. When she was near Buoy R36 the Reiss altered her course to port to 358° true on her gyro compass, the regular course for upbound vessels in the vicinity of Willow Point and Roberts Landing. In view of the location of the Avery close to the Canadian shore the Reiss made her turn further downstream than usual with the result that she was navigated close to the American shore. By this time the Platt had caught up to with ⁴⁄₁₀ of a mile of the Reiss. Due to the Reiss' very slow speed the Platt was checked down to dead slow on her engines in order to stay behind the Reiss. Thereafter, the Platt maintained the same distance of ⁴⁄₁₀ of a mile behind the Reiss, both vessels going at the same speed of 2 miles per hour over the ground or at bare steerageway. Both the Reiss and the Platt heard the Avery sounding at regular intervals the prescribed whistle signal of one short, two long and one short blasts for a vessel at anchor in fog.

9. As the Reiss passed Willow Point close to the American shore, the position of the Avery had not changed. The Reiss continued to sound three blast fog signals every minute as did the Platt and the Avery continued to sound anchor signals.

10. As the Reiss continued upstream close to the American shore and her captain constantly watched the target of the Avery on the Reiss' radar, there was no significant change in the target until the Reiss was approximately 1000' from the Avery. It then was noted that the Avery was moving out to the center of the channel and was crossways in the channel heading toward the American shore. When this situation became apparent to the Reiss, the Reiss' captain was surprised by this sudden change in the Avery's position and he instructed the Reiss' mate to call the Avery and advise that she was drifting down on the Reiss. The mate dialed in on Channel 51, the open channel constantly monitored on all vessels, and gave the message but received no answer.

11. About the time that call was completed the Avery was observed visually emerging out of the fog about 300' away. The Reiss' rudder was put hard left and her engines full speed ahead to try to avoid contact. The Avery was first observed at a 90° angle to the Reiss moving rapidly ahead across the river in a westerly direction and swinging to her left or downstream. The Reiss called by voice to the Avery that she was moving down on the Reiss.

12. When the Reiss' rudder was put hard left with her engines full speed ahead, she swung approximately 25° to left after which her rudder was put hard right, her engines were reversed to full astern and she dropped her starboard anchor. With the rudder hard right and her engines backing full astern the Reiss' heading swung back approximately 5° to right. The Avery continued ahead with her bows swinging downstream until her stem, towing shackle and starboard bow struck the Reiss' starboard side with a severe blow approximately 48' aft of the Reiss' stem, the angle between the two vessels at the time of initial impact being about 35°. After the initial severe impact the Avery bounced away from the Reiss and then struck her again on two subsequent occassions along the Reiss' starboard side

with resultant damage to the Reiss in all three instances. At the time of collision the Reiss had headway of approximately 2 miles per hour and the Avery's speed was 5 or 6 miles per hour.

13. At the initial impact the Reiss was as close to the American shore as she could get with safety and she could not have moved over any more to her left or to the west. The force of the collision caused the Reiss to heel over to port and she was driven into the west submerged channel bank. Her port side aft struck the bank causing damage to the Reiss' port side.

14. After the Avery dropped her stern anchor at 5:00 A.M. with almost the entire 70 fathoms or 420' of chain out, she lost her headway and was stopped in the water. Although the Avery's radar was in operation and reportedly working properly, her position in the river was not determined on radar. Consequently, in spite of the fact that her captain and first mate estimated that position, the Avery's officers did not determine where the vessel was. Her anchor lights were illuminated and she commenced sounding the prescribed anchor whistle signals and bell signals. Visibility then was 200' to 300' and did not improve up to the time of collision.

15. The Avery's second mate, who was handling the controls on the stern anchor windlass, was then ordered by the captain to take in on the stern anchor chain. Thereafter, the Avery's forward starboard anchor was dropped and subsequently the second mate reported that a pin had sheared on the stern anchor windlass. The first mate then was sent aft to help the second mate, leaving the captain as the only officer in the pilothouse.

16. After the Avery was motionless in the water on both anchors, it was noted on her gyro compass that her heading was slowly changing to right as a result of her stern drifting to port. It is apparent that current in the river was stronger than usual and this caused the stern anchor to drag with the consequent swing of the Avery's stern. The

Avery's captain then called aft on the ship's telephone and learned that the vessel's stern was getting close to the Canadian shore. It was reported from the stern that lights and a boathouse were visible on the Canadian shore and there was concern about hitting the Canadian bank and possible damage to the Avery's rudder shoe. The Avery here got into the position seen on radar by the Reiss with her stern 450' from the Canadian shore and her bow extending out into the river.

17. The Avery's starboard anchor then was raised and her engines were worked first slow ahead for 1 minute, then half ahead for 5 minutes, then full speed ahead for 9 minutes with her rudder hard left, the intended purpose being to swing the vessel's stern back toward the American side of the river. However, due to the current and her position crossways in the channel, the Avery did not respond until after her engines had been worked full speed ahead. As a result of such action, the Avery crossed from close to the Canadian shore toward the American shore traveling almost westerly across the river.

18. The Avery's radar was located alongside the front window of the Avery's pilothouse where her captain was stationed and the radar was turned on and operating. However, her captain denies seeing either the Reiss or the Platt even though he claims to have looked at the radar now and then. Moreover, crew members of the Avery reported hearing whistle signals from the Reiss and the Platt as long as 35 minutes before the collision. For sometime before the Reiss was observed visually, the Avery's third mate was reporting such whistle signals and pointing out to the captain the direction from which the signals were coming. Nevertheless, the captain denies hearing any fog signals or receiving any reports until just before the collision. The fact is, however, that the captain of the Avery could hardly have failed to hear the signals and thus he knew of the approach of the Reiss and the Platt for at least one-half hour, in spite of his testimony that he never knew the Reiss was in the river. He was so much concerned with the stern anchor problem aboard his own vessel that he neglected the far more important duty of observation and safety of the Reiss.

19. About a minute before the collision the Avery's captain acknowledged the approach of the Reiss by the sound of her fog whistle signal close on the Avery's port bow and then, and only then, looked at his radar. However, it was too late as the Reiss was in such close proximity as to be out of the effective radar range. Only then did the Avery sound a danger signal and back her engines. Thereafter, the Reiss was observed visually about 100' to 150' away off the Avery's port bow. The vessels came together rapidly in a very short period. At the collision the Avery was in a southwest and northeast position.

20. In that position, southwest and northeast, with 450' of anchor chain behind her the Avery actually was obstructing 1050' of the width of the river in a time of dense fog and her forward end protruded into the flow of traffic, having crossed from close to the Canadian shore into the channel in which traffic still flowed or the channel in which the Reiss was operating. The Avery was in the flow of traffic northward in the channel and didn't know it.

21. When the Reiss' port side aft hit the submerged channel bank, there was not much more than 52' between the Avery's stem and the bank itself, meaning the only thing between the stem of the Avery and the west bank was the Reiss with its 52' of width so that the Avery as of that time was almost on the verge of running into the west bank when she came into contact with the Reiss. The fact that the Avery got into that position was due to her failure to use her radar scope, nobody looked. Had she done so she at least would have known where both shores were. Because she did not use her radar, she was blind and did not know her position at any time.

22. The speed of the Reiss at the time of collision was 2 miles per hour. When

the Reiss' engines were worked full speed ahead on left rudder, her speed did not increase noticeably. Hard left wheel takes power out of the propeller and the ship looses some forward motion but gets a swinging motion which, with the current striking her starboard bow, was the movement of the Reiss immediately prior to collision. Consequently, the Reiss in fact was moving away from the Avery toward the American shore at the time of impact.

23. Both vessels came to rest in the river close to the American shore shortly after the collision, the Reiss having dropped her starboard anchor and subsequently coming to rest on that anchor heading upstream. The Avery came to rest heading downstream and dropped a forward anchor 10 to 20 minutes after the collision. A number of the Avery's crew members, as well as Captain Goodberry, who was first mate on the Platt, and Mr. Harry W. Brockmiller, a shore witness, heard more than one anchor being dropped immediately after the collision. The Reiss' watchman testified that the Avery dropped her stern anchor immediately after the initial impact between the two vessels. Though the Avery vehemently denies that her stern anchor was raised prior to the collision, there is some additional evidence from crew members of the Avery which indicates that the Avery's stern anchor could have been raised and then dropped again at the time of or immediately after the collision. It seems to the Court that she couldn't have moved away from the Canadian shore without taking it in. Whatever the fact in that regard, there is no question that the Avery was loose and moving at the time of the collision either by reason of the current striking her as she was practically broadside in the river or by reason of the use of her engines, or both. Consequently, it is not necessary for the Court to make a specific finding as to whether or not the Avery's stern anchor had been raised.

24. The collision occurred approximately 5/10 of a mile above Willow Point.

Neither vessel moved any substantial distance after the collision, the Reiss coming to rest about 300' upstream and the Avery coming to rest about 700' downstream.

25. The Reiss observed the Avery on her radar scope constantly and heard the Avery sounding anchor signals until just before the collision. The Reiss gave all necessary signals for a ship in motion. She moved with caution and headway just sufficient for steerage. The Reiss was proceeding normally in her proper place on the American side of the river. She could hardly go any more slowly and had the right so to navigate. When the Reiss first saw the Avery's westerly movement over the river, she turned left to port toward the American shore to prevent or reduce her hazard. The Reiss was unable to avoid the collision because the Avery was in an improper position in the river traveling westerly and because the Avery's last few seconds effort was too late to prevent collision.

26. The first actual notice which the Reiss had from the Avery of a change in the Avery's position was the five blast danger signal which the Avery sounded just a few seconds before collision. The action which the Reiss then took at the impending collision probably prevented a lot more danger to people and a lot more danger to property than any other action which she could have taken. The Reiss' movement had some resemblance to the innate right of self-defense planted in men. Instead of making other possible movements at the time and place in question and in that danger which he then faced, the captain of the Reiss so maneuvered that he would take a glancing blow from the Avery rather than a direct hit. Such action prevented a far greater catastrophe than that which transpired.

27. The use of their radar scopes by the Reiss and the Platt constantly informed them of their respective positions. Use by the Avery of her radar scope would have informed the Avery not only of her own position but of the

position of the Reiss. The Avery heard the slow steady advance of both the Reiss and the Platt upbound for some 30 or 35 minutes by fog whistles and made no effort to find their radar scope position. One look at the Avery's radar would have enabled her to sound a danger signal in time to have prevented the collision. Instead the Reiss' officers received no notice from the Avery until this collision impended. The Avery's failure to notify the Reiss of danger sooner constitutes fault and negligence on the part of the Avery.

28. Vessels are not required to have radar but when they have it they ought to use it. The Avery had one but it was not properly used. Scientific installations such as radar are potentially most valuable instruments for increasing safety at sea but they only remain valuable if they are intelligently used, and if officers responsible for working them, work them and interpret them with intelligence. That is only another way of saying a good lookout must be maintained. A good lookout involves not only a visual lookout and not only the use of the ears but also involves the intelligent interpretation of the data received by way of such scientific instruments. If the Avery had used her radar scope with any propriety at all, she would have seen both approaching ships as both approaching ships had seen her long before. The failure of the Avery to use her radar constituted absolute lack of a lookout with the result that the Avery in fact really had no lookout, which constitutes fault and negligence on her part.

29. The Reiss was not negligent in the matter of the collision and was without fault. The cause of the collision, the thing but for which it would never have happened, was the absolute lack of lookout on the Avery, the failure to look at her radar scope.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction in the premises.

2. Fault and negligence on the part of the Avery was the sole and proximate cause of the collision.

3. The Reiss was seaworthy and properly equipped, competently manned, maintained an efficient lookout at all times and exercised care and caution in her navigation in all respects.

4. The Reiss complied in all respects with Rule 15 of the Rules of the Road for the Great Lakes in that upon hearing the fog signals of the Avery she proceeded at bare steerageway and navigated with care and caution.

5. Having located the Avery's position on radar and having heard the Avery constantly sounding anchor fog signals, the Reiss was entitled to proceed up the channel as she did close to the American shore.

6. The Reiss took all measures necessary to advise the Avery of the Reiss' approach in the fog and was entitled to continue proceeding as she did.

7. At all times as she approached the Avery, the Reiss continuously sounded three blast fog signals at 1 minute intervals in compliance with Rule 14 of the Rules of the Road for the Great Lakes.

8. The Reiss had the right to assume that the Avery was complying with the law and the rules of navigation and was not required to anticipate that the Avery would be moving in the fog as the Avery constantly sounded fog signals for a vessel at anchor prior to the collision.

9. When the Reiss became aware of the Avery's westerly movement in the river, there was no action which she could then have taken to have prevented the collision and the measures which she did take were fully justified by the dictates of good seamanship and the Rules of the Road for the Great Lakes, particularly Rule 27.

10. The fact that the Reiss did not sound a danger signal and stop and reverse her engines when she became aware of the Avery's westerly movement across the river, was not in violation of

Rule 26 of the Rules of the Road for the Great Lakes since such action on the Reiss' part would not and could not have prevented the collision and therefore was not a factor contributing to the collision.

11. The action which the Reiss took at the impending collision was proper under the circumstances and was authorized and justified under Rule 28 of the Rules of the Road for the Great Lakes. Such action prevented a lot more danger to personnel and property than any other action which the Reiss could have taken.

12. At all times the Reiss maintained a proper lookout in compliance with Rule 28 of the Rules of the Road for the Great Lakes.

13. In her navigation the Reiss complied with the Rules of the Road in all respects.

14. Those in charge of the navigation of the Avery were careless, negligent and inattentive to their duties.

15. The Avery failed and neglected to maintain and keep a competent and vigilant lookout and, due to failure to use her radar, in fact maintained no lookout at all in violation of Rule 28 of the Rules of the Road for the Great Lakes.

16. Failure on the part of the Avery to use her radar to determine her own position in the river and to determine the approach and position of the Reiss constituted fault proximately causing the collision.

17. The Avery negligently announced over her radiotelephone that she was at anchor in the vicinity of Roberts Landing when she did not in fact come to anchor in that location.

18. The Avery continued to sound signals for a vessel at anchor when she was in fact underway in violation of Rule 14 of the Rules of the Road for the Great Lakes.

19. The Avery while underway failed to sound the required three blast fog signals in violation of Rule 14 of the Rules of the Road for the Great Lakes.

20. The Avery improperly sounded whistle signals for a vessel at anchor when she in fact was not at anchor.

21. When the Avery knew or should have known that she was moving in the direction of the Reiss, the Avery took no measures to stop her way.

22. The Avery failed to take proper measures in accordance with the dictates of good seamanship in that she did not announce over radiotelephone that she was in fact underway after announcing that she was coming to anchor.

23. The attention of the officers of the Avery was so concentrated on the problem of the Avery's stern anchor chain impediment that the Avery neglected her duty of observation and safety with respect to herself and to the Reiss.

24. The Avery failed to sound a danger signal in time to warn the Reiss of the Avery's westerly movement in the river which failure on the part of the Avery proximately caused the collision.

25. The Avery negligently navigated westerly across the river from the Canadian shore into the channel in which traffic still flowed and thus obstructed the channel.

26. The Avery was solely at fault in causing the collision.

27. The Reiss is entitled to a decree for her full damages against the Avery, together with interest and costs.

28. The Avery's cross-libel should be dismissed.